Good morning. My name is William Arnett. I'm from St. Louis and I represent a family company that you have named. This is a case that will determine whether an insurance company is insurance agent to the reason across. In a way, that they will notice prior to determining whether an insurance company is insurance agent to the reason across or whether they can get away with the reason across with no intention of ever selling them anything. And certainly, it's a familiar concern most of the time. We have people on the insurance front who have operated for several years and we keep them on the line at the time. So, I'm not concerned most of the time, but there's two things that I want to make clear. One is that insurance companies are a new discovery for some retailers. We never got to be the discovery of the case. We were never able to even find out what were the conflicts between Wells Fargo and our competitors as far as their re-venture goes. We were not even able to discover a master of policy in the status of an insurance company coverage. There was a certificate issued to the organizers, but you could not put that right on the place. It became a master of policy, and if master of policy falls over, we think we're going to find a big misdemeanor as far as their relationship goes. We're afraid of losing that. We're afraid of losing no discovery as a consequence of such a sell-off. Wells Fargo published a blog about it, about American Bankers and their cases, and so on. We're looking just at the new discovery, and there's no consistency as far as that goes. Well, it's not an issue for me. I'm not concerned about the claim of the position, because it's I'm not concerned about that. I know that there's disagreement between these two people in between Wells Fargo and American Bankers, because they have this relationship, and it is a master of policy, and there's a contract that I made with them that says for exactly how they're going to share profits, how they're going to manage control of this venture, of this business class, to increase the payout for Wells Fargo customers. I think that's a matter of policy. So, I'm not sure that, in the next couple of years, there's going to be a proposed amendment that's going to be in the hands of a group of suggestors. And that's, I think, why this is so complicated, because you can't imagine that all of the banks will support the joint venture, because they're not going to be here, and despite that claim I wrote to them, it's just that they were a joint venture, and they're responsible for each other's conduct. They're just a huge part of that. And so, it's difficult to conduct a discovery as to exactly what the truth would be on a joint venture. But why? Because we're not privy to the contracts that we make for them. We understand that there will be other stakeholders in the relationship, and it's going to be possible to produce a discovery. And that issue of what this venture's on would have to be resolved after this discovery, and we determine more about those facts. So, it's... Yeah, I've already stopped, but... Well, we're speaking in person. Well, they want to be able to... They want to be able to... There are questions. Well, the questions are, because of these circumstances, because he was disabled in December of... I can't remember the year now. Yes. In December, I think, August, when you told him that he was going to be charged for huge numbers of disabled persons, and his illness was gone, essentially. He was progressively losing his social security numbers over time, and by the end of December, he started saying that he could no longer work because of this illness. And so, he did not have the correct disability that he should have had in December. And so, I can't really say how much that is. That's my point. I was just thinking, you know, the cost of doing that work, and to bring in cost of saying, are you saying that the cost of the work is already too high? Are you already... The work is still in existence. Yeah, sure. I mean, we're in the same boat. We're in the same boat. Because he's already... He's already disabled, so he's already used to the policy. So... I'm going to try to answer some of the questions that are being asked. In your recent audits, you awarded disability to the victim in December, to be terminated. And so, you're supposed to have an audit for disability to the victim in December, to be terminated. Do you agree with that? Yes. It's fair. Well, what's your perspective on that? Because that would actually be the same in this case. Normally, that would be up to the files or the sorting pages, and it's not like that. Motions currently under Rules 12-B-6 and 12-C do not apply in this case, or are appropriate because of the value of the claim 12-12. there's nothing that comes to speak on terms of coverage. Coverage, to a large extent, goes over. And a lot of evidence is still out in all of the courts, where there are many claims made that we're still making premium claims, and we're not just making coverage, we're not making premium claims. And, or, a claim was pending that didn't happen until literally years and 16 months later. So, this is not a case where the company is like, oh, you need to get on the case. There is no claim pending. There's no premium. It's only coverage. Okay. Well, I'm curious. In other words, you make use of the call. I'm sorry. Did you make use of the call? Did you make use of the insurance? No. And there are two different types. You can, on the other hand, mortgage you to other areas of the law. Sure, in fact, but once your coverage terminates, on the insurance side, you can't cure a bad claim. You can't cure a bad claim. And you can do this in new coverage rules, in new carrier. You can't coverage a bad claim. But you can cure on the insurance side when your coverage terminates. You can cure on the mortgage side. Okay. So, I'm going to pass the mic to you. But now I'll give you a chance to talk. Thank you. This is a simple case where you have a negative promise. You will be notified prior to termination. The case is going to be based on the distinction between cancellation and termination. Those words seem like the same thing. Because you don't have insurance anymore. It doesn't matter whether it's termination or cancellation. The main thing people notice in August is that they cancel them. In March before, August was the date that said they took the interest on that date. The insurance and mortgage agreement was fully up to date. Where the date March 28th is misremade. It's never been established. People think that they were short on insurance. Not the March payment. As far as me, it makes no sense at all. And they split that notice in August. And split and pause their agreement. If you get a copy of your insurance card, you will be notified prior to termination. Why would you keep that promise? If you were notified prior to termination, they said, if the idea that it applies, that you could do something about it, we're going to notify you before your insurance terminates, so that you can have that. And it asserts you that you have the ability to have it. You have the ability to take cash out of the insurance, bring it here, and take the interest on. And then they would all enter the sort of format that they were starting to make, they actually did just about anything, including the transcripts. And, you know, in the public statement, they're actually crediting $2,200 in transcripts, which is more than the insurance premiums. On the issue of figures on statutes on default, the statute itself says, according to the city's library, the default is true, it is that there is no reason for default, and, of course, according to the statute, it's almost a statutory relationship between the budget and our client. But if the default had occurred, if no default had occurred, you know, I think it's very important to look at how you're going to pay interest, how much you're going to pay, how much you're going to pay by the end of the year, how much you're going to pay by the end of the year. You know, just be aware of what that means, and how you're going to pay interest. You know, what the practice was here, because the first one that they wrote, they were sort of arguing, rather than sending a notice to people that would say, oh, I'm sorry, you know, last month, you know, okay, what they did, this is the practice, what happened here, what they did was they said, here's how much you're still on board, here's how much you're still on insurance premium, here's your new premium for flex insurance, combined with what was, what? Priority insurance repayment. Right, so, well, so, I know, but, as far as the actual company, so, so, well, they were, everything was on there. I'm, I'm, I'm not, I'm not, I'm not, I don't think they were, they were not in the range of,   the, and the fact that they received the commission, and,
judges: Ikuta, Watford, Watson